with our system, the red light, the yellow light, the green light. The yellow light means you have two minutes. The red light means cut it off unless we're questioning you. You don't get to run away if we're questioning you. Please recall that rebuttal is for rebuttal only. And also, if you are talking about something in the record, please give us a record site. That's very helpful. We have, my colleagues have memorized the record, but I have not. So it would be helpful if you give us a page. That was a joke. You can smile. Okay. We will call 18-30813, United States v. Waguespack, and we'll hear from Mr. Winston first. Good morning, and may it please the Court. Sam Winston and Kara Larson on behalf of Christopher Waguespack, the appellant in this case. I'll be handling our main argument, and Ms. Larson will be handling rebuttal. Your Honors, I want to focus our oral argument today on the Confrontation Clause issue. The Confrontation Clause is straightforward. A person accused of a crime in this country has the right to be confronted by the witnesses making statements. Did you object? I'm sorry? Did you object on Confrontation Clause grounds? We did, actually, Your Honor. Well, let me say So we're not on plain error review on the Confrontation Clause? I think we need to walk back, actually, what we said in our reply brief, based on what I found reviewing for our oral argument on page 998 of the record, which is government was questioning Agent Ferris about getting ready to ask him about what investigators received based on their review of the downloads, and it goes like this. Sir, based on your review of that record, did investigators receive any information regarding conduct by an Internet protocol address? And I'll read it to you. And then here comes Defense Counsel's objection. Objection. Court, what's the objection? It's the witness's personal knowledge and foundation. If he didn't have anything to do with the investigation, he's just going to testify about what he read in some documents and what it appears is happening. So he doesn't say Confrontation Clause and he doesn't say hearsay, but I think he is objecting to the fact that Agent Ferris is about to testify about what Agent Ratcliffe did. And so I think we do have a de novo standard of review. But even if we are under a clear error standard of review, I think we satisfy that as well, Your Honors, because what you need for that is an error, one that's clear and one that involves a substantial right. And here we're talking about Confrontation Clause. Specifically, we're talking about was the government allowed to bring in the actions, the investigative actions, that nonverbal conduct that are statements of Agent Ratcliffe through Agent Ferris. And our position is that was a violation of the Confrontation Clause because Agent Ratcliffe was the main agent in this case. He was the one who started the search. He was the one who set the parameters for it. He's the one who then verified it. He's the one who then put that information onto a CD and then put it into an evidence locker. And then he's the one that went to a judge and said, I swear, Your Honor, that I have probable cause to go search Mr. Wagaspak's house. And then he again said, I, Your Honor, have probable cause to arrest Mr. Wagaspak. If we're talking about a person having a right to face their accusers, the main accuser in this case was Agent Ratcliffe, and he didn't testify. Instead, they brought those actions in through Agent Ferris. And specifically, Agent Ferris does end up acknowledging that about what he's doing. He talks about, he starts using the word we reviewed this, we did that. And what he means is Agent Ratcliffe did that. And that's a violation of the Confrontation Clause. Specifically, on paper. But what that actually impacts the material evidence that was given. In other words, you say he did that, he did that. So if somebody else put a bunch of stuff on the computer and I print it out, and all I'm saying is I printed it out and that's all that matters, is the printing it out and not the content, then how does that make it a Confrontation Clause? It matters, Your Honor, because there was testimony that confirmed that it's not just the report, it's not just the logs, it's what the agent, what Agent Ratcliffe did to confirm what those logs purported to show. And that's what Agent Ferris was testifying about. What specifically did he testify to that goes beyond printing out the logs? Well, Your Honor, on page 1010 of the record, he says, we reviewed, we compared the logs to the actual file that was downloaded, and it was the same file that was downloaded with the logs. However, on page 998 of the record, he says, he went and asked by the government, did you have any investigative role in this particular case for which we're in court today? And he answers, no, ma'am, I didn't. And then on cross, it becomes clear what he's talking about is all those investigative actions of setting the search, of then going back and confirming it, taking that evidence, putting it on the CD, confirming that those were in fact child pornography files, confirming that the IP addresses were actually the ones that the computer showed that a file was downloaded. He didn't, Agent Ferris, Agent Ferris didn't have anything to do with that. He was testifying about what Agent Ratcliffe did. And so that, to me, is a confrontation clause violation without even getting to the substance of the report itself, which I'm happy to talk about as well, because I think it's all one in the same confrontation clause violation, but there are two parts of it. Was Mr. Wagespat convicted based on the substance of the report? Yes, Your Honor. He was. As far as what the report spoke to, it spoke to a couple different things. One, I think it spoke to actually both counts that Mr. Wagespat was convicted of, both for possession and for distribution. I guess I'm asking, is there evidence independent of the report on which his conviction was based? Yes, Your Honor. That's based on what Agent Ferris was testifying about what Agent Ratcliffe did. Well, wait. Let me make sure you understand my question. Is there evidence independent of the report that you say is a confrontation clause violation? Is there evidence that's independent of that on which his convictions were based? I want to make sure I understand your question, Your Honor. You're asking if, besides the report, what evidence supported the convictions? So we had, there was testimony from four witnesses total in the case. There was testimony from Agent Ferris, who, again, had no role in the investigation. There was testimony from Mr. Wagespat's parents, and that testimony, I believe, was used to show who was using the computer in question, and there was testimony from a forensic expert based on the searches that they did of the devices. So the testimony of the forensic expert about the various file paths and partitions and whatnot on the computer, that's independent of Agent Ratcliffe's report that you say was a confrontation clause problem? Right. That goes more to the possession count, but I think that even the report itself speaks to both, because it talks about where those files came from. The forensic examiner's testimony is separate from Ratcliffe's. Correct. Correct. So looking at the report itself, we know from cases like Bull Cumming and cases like Melendez-Diaz that if you have a report that is made for the purposes of creating evidence and is used to aid a police investigation, then it becomes a testimonial report. And I know that the government has pointed to some cases about machine-generated data, but our position is that this case is different, and it's different for a couple reasons. It's different, one, because in the cases cited by the government, Lizarraga, Tirado, and Ballesteros from this court, we're talking about a Google map image, a Google Earth image. That's different from a law enforcement-generated report like the Torrential Downpour report. Law enforcement is the only one that has access to this software. They're the only ones that can make these reports, and they make it for the specific purpose of creating evidence. It's not a commercial product that law enforcement then goes behind and uses. And separately, in the Lizarraga-Tirado case, there was an agent who testified about the coordinates that she put in to produce that image. Here, Agent Ratcliffe wasn't available. He was available but wasn't produced for cross-examination. And so we think that it's different that way. But also I want to point out some instances in the record itself where the report is actually speaking through Agent Ratcliffe. It's different than a Google image. And in the Lizarraga-Tirado case, it talked about once you start manipulating that Google image, you start placing markers on it, then it does become to start making statements, and it's not just machine-generated. And in the record on page, for example, 1598, the report has lines that say things like this, Client sent us a peer ID. What that says is Mr. Wagaspak's computer sent law enforcement the ID that we're looking for. That's more than just data. That's starting to become speaking. And there's multiple examples of that. Same page, peer ID, we sent the client. Another one on page 2971, the client may no longer be sharing the torrent. 447 pieces of 59 — 593 pieces possessed by the client were downloaded. Those assertions that you're reading from the record, were they also backed up by the data or the report or something physical that showed those facts? I'm sorry. Go ahead. Those were in the report itself. And as Agent Ferris testified — The report was there. It was obviously introduced in evidence. Correct. As an exhibit. Correct. Exhibits 1, 2, and 3, there are different versions. Was it authenticated? Was it authenticated by a witness? Well, the government was allowed to have it authenticated by Agent Ferris, but he's not the one who had the report generated. Was he in a position to authenticate that it was what it purported to be? No, he wasn't, Your Honor, because he wasn't the one who generated it. Agent Ratcliffe is the one who initiated the report. He's the one that put in the parameters for which the search should be. And he's the one, after the data was there and after the files were downloaded, he's the one who verified it and then put it onto a CD. And Agent Ferris even says at one point, I didn't have anything to do with that CD until after it came from the evidence locker. So he wasn't able to, under the law, authenticate it. And just to be clear, when you said in your reply brief to this Court that the Confrontation Clause objection was not properly made, but now you're saying that it was, and what you're pointing to is ROA 998. Correct. In which you did not use the word Confrontation Clause. Did you even use the word hearsay? No, Your Honor, but he is objecting to Agent Ferris testifying on behalf of what Agent Ratcliffe did. And you think that was sufficient to bring to the district court's attention that you were making a Confrontation Clause objection? I do, Your Honor, because in the question that he was asked, he's asking, he just says, I didn't have any role in the investigation, and then he's asked about conduct that investigators received. So that's the objection. And why couldn't that be construed as just a simple hearsay objection? Well, what makes it a Confrontation Clause violation is if it's a testimonial statement that's made out of court, right? And because it's testimonial, I think, to answer your question more directly, is what makes it more than just hearsay. And I want to also point out that the concern that the U.S. Supreme Court had in Bull Cumming about using surrogate or substitute testimony from law enforcement was not a hypothetical in this case. It's actually present. Agent Ratcliffe was fired from his job. He was only there for less than a year, and he actually messed up the dates in reporting and swearing before a judge. And so there's a reason why the government didn't call Agent Ratcliffe. They didn't want him to testify. But they needed him to because he's that main accuser against Mr. Wagaspak. I guess unless my colleagues have questions about Confrontation Clause, I just want to ask you a couple quick questions about the evidence, if I may. Sure. Now, you're raising a sufficiency of the evidence challenge. Correct. So we have to look at that from the point of view of whether a rational jury could have inferred the requisite elements. So is there evidence from which a rational jury could have inferred that Mr. Wagaspak was the predominant user of this computer that was in his bedroom? Yes, there was, Your Honor. And is there evidence from which the jury could have inferred that he installed a peer-to-peer file sharing program on his computer? Yes, there was. Texati? Yes, there was. Is there evidence from which the jury could have inferred that he changed default settings in Texati or manipulated? Well, let me just stop there. Changed default settings? I believe what we said in our brief was that he didn't change the download settings, but he did change where they were going to. So he made changes to it. I believe that's correct, Your Honor. Is there evidence from which the – is there evidence that this program notified users of the program that there was uploading and downloading going on? I believe that there was a window that pops up that shows what's going on. That's correct. Is there evidence that Mr. Wagesbeck used cleaner programs, for lack of a better term, cleaner programs to hide his tracks with respect to file paths that appear to have been child porn folders? Our contention, Your Honor, is that those are common-use programs that have multiple uses. But were they used? They were, in fact, used. All right. I mean, we're not necessarily saying that's nefarious, but there was evidence they were used. Right. Correct. Correct. In fact, they were used to hide – I mean, to wipe. I'll also use a neutral term, to wipe activity with respect to folders such as folders called PTHC. There is evidence in the record of that, Your Honor. And PTHC is – I won't repeat what it means, but it's a child porn-associated – Correct. Correct. And I see that I'm running – So your confrontation clause argument, plain error or de novo, is for a new trial? That's correct, Your Honor. We believe that these convictions should be vacated, both of them, based on that error. Right. But there is the question of whether you're saying vacated and remanded for a new trial or vacated and rendered. And on that one, you would be saying vacated and remanded. On the sufficiency of the evidence, you would be saying vacated and rendered. Correct. Correct. And assuming you've preserved the confrontation clause challenge, it would be subject to harmless error review. Wouldn't you agree? It would. But the only evidence – some of the only evidence – the only evidence on the distribution count was from those confrontation clause issues. And there was also strong evidence for the possession count from that report and that testimony as well. As I read the record – I could be wrong – but as I read the record, the forensic examiner testified to the use of TXADI on the computer or the changing of the default settings. The forensic examiner testified to that in open court. Right. But he wasn't the one who set up on the law enforcement side of what they were doing. And just remind me, for sentencing purposes, if we were to affirm as to the possession but vacate as to the distribution and the government did not refile or re-prosecute the distribution, what would happen to the sentence? Would it need to be redone or was there a clear – I'm just not remembering, I'm sorry, because I didn't realize you were making this distinction. That's something I'd have to – I don't know that offhand, Your Honor. Okay. Well, I'm sure your colleague on rebuttal will be eager to respond. Yes, she will be. Okay. Thank you. Thank you, Your Honors. Good morning, Your Honors. Patricia Jones for the United States. May it please the Court. I'll address the confrontation issue, of course, since that's what my opponent decided to address first. Do you know the answer to the sentencing question? I mean, if – Your Honor, I think it would need to be resentenced. Well, resentencing, not just take this out. Yes, ma'am. Okay. Yes, ma'am. I'm sorry. Go ahead. First off, counsel's argument seemed to be addressed to testimony by Agent Ferris as having violated the Confrontation Clause. That's not what his brief argued. His brief argued that the admission of certain United States exhibits, which he has called reports, violated the Confrontation Clause. So this is – I'm honestly not very familiar with what he's arguing because this is different than what he put in the brief, and I would submit that this argument about certain testimony of Agent Ferris violating the Confrontation Clause is waived for failure to brief. And also the – I mean, we can check the briefs and see what he argued, but I do recall it being conceded that we're on plain error review. What's your response to – if you have any. I'm not sure if you were notified that – about the record citation for where there's a purported Confrontation Clause objection made, but I'm not sure what – do you have a view as to whether a Confrontation Clause objection was being made? Your Honor, I'm not familiar with that page, but I think counsel admitted that Confrontation Clause wasn't mentioned, hearsay wasn't mentioned. And as I understand his description of that page, the testimony on that page, he was objecting to certain testimony by Agent Ferris about something. And so that's different than objecting to the admission of these records, which is what he objected to in his initial brief. Those records, no objection was made on a Confrontation Clause basis or on a hearsay basis. The only objection as to all of them was authenticity. So I do think we're on plain error standard of review, and the defendant did acknowledge that in his reply brief, that it should be plain error. Those exhibits that we're talking about, United States Exhibits 1, 2, and 3, and then he also objected to admission of the images of child pornography itself. Now, he didn't mention that today, but the objection was to the logs, which he has been calling reports, and to the images of child pornography. United States Exhibits 1, 2, and 3 were just machine-generated logs. They look like this. And I wish I had handed out some copies, but if you turn, this is the first page of United States Exhibit 1. It's at Record 1576. And it's just pages and pages and pages of logs. It's not a report by Special Agent Ratcliffe. It's machine-generated logs. And I cited in my brief the testimony by Agent Ferris about how those logs are generated, but I overlooked one citation, which is Record on Appeal 1069, because it is very short and sweet. He's asked about those records, United States Exhibits 1, 2, and 3, and he's asked how are those records created. His answer, that's an automated record that's created, that the investigator doesn't deal with, doesn't alter, it literally is automated in the background. So what we're talking about here is just something that was spit out of the computer. That's what Ferris was saying. Yes, Your Honor. The exhibit that you just cited, Exhibit 1, which I'm now looking at, and it's fascinating. Just fascinating. Yes, Your Honor. Okay. And because we're dealing with it. Oh, okay. She said it was just a list of entries, and it is. Right, right. And this United States Exhibit 1, I just printed out a few pages. It was 900 pages long. It's a big log that the computer just generated on its own. The torrential downpour software that's used by law enforcement just printed it out. What about this notion of you said he didn't raise this in the briefing, that Ferris was sort of explaining the investigation that Ratcliffe did. Would that be a confrontation clause violation, assuming he preserved the error, or at least raised the error? Unless he was repeating statements made by Special Agent Ratcliffe that were testimonial in nature, I don't think it would be a confrontation clause issue. It would be perhaps a lack of personal knowledge. But if he says we executed a search warrant and he wasn't there and he's just repeating at the office, I don't think that's a confrontation clause problem in the first place. He's just saying. But I also, Your Honor, don't recall him making those kinds of statements. He talked about comparing what was in the log to the images, and I think he was saying that he did that. And so I don't have any recollection of him making a bunch of hearsay statements about what other people were doing. He talked about peer-to-peer software. He talked about online investigations. And he talked about these logs, how they're generated, how the images are put on what their process at the Attorney General's office is. So that's how he authenticated it, by the process and the chain of custody and getting it out and how torrential downpour works. But I don't honestly recall anything that could be considered a confrontation clause problem in the testimony, and unfortunately I'm not able to focus on exactly what he's talking about because I didn't have any notice prior to today that he would be arguing that. Well, and if it truly is a brand-new argument, it's waived by raising it in oral argument. Yes, Your Honor. I believe so. Raising it for the first time in oral argument, I should say, to clarify. And he mentioned the Bull Cumming case. The Bull Cumming case simply doesn't apply to machine-generated records. And in that case, there was a certification signed by the analyst that everyone agreed was an out-of-court testimonial statement. Well, they might not have agreed it was testimony. It was, in fact, a statement of a person. These records are not statements of a person, so they are not hearsay and they don't violate the confrontation clause. And even Justice Sotomayor mentioned in her concurrence in Bull Cumming that the case did not involve something like a gas spectrometer to spitting out machine-generated records. I'm now looking at this same exhibit that you cited that's got so many entries. He cited specifically ROA 1598, and it has this state. It has client acknowledges it has pieces 444 to 444, which encompasses all of file 224. Client acknowledges it has this and this. What does that mean, and how is that just a spit-out from a computer? That is the client is the other computer, and so the law enforcement computer is talking to the. . . So this is not Mr. Wagespach admitting something. No, Your Honor. This is not the investigator investigating and finding that out. This is how the computer talks about the other computer. Yes, Your Honor. I'm computer number two, and I call computer number one client. Exactly, exactly. And there's certainly no evidence to the contrary of that. No, Your Honor. Was the jury told that, or would they have thought this meant Wagespach said all this stuff? Oh, I'm sure the jury would not have thought that, Your Honor. The testimony by Special Agent Ferris was very clear that these are machine-generated records. There are numerous places in the record where he talks about how it was generated, but the most clear place is the one I read to you this morning at page 269. His site two client acknowledges it has these pieces, it has this and this. All of that is a computer saying what the other computer is telling him, telling it. Yes, Your Honor. In this world of robots, we start treating them like humans. So computer number two is hearing what computer one says, and no Supreme Court decision says two computers talking to each other is a confrontation clause issue. That's correct, Your Honor. Someday we may get there, but we ain't there yet. I hope we don't get there. And, Your Honor, I have to say, which one of the computers is the client? I'm not sure. Well, wait. At the first page it says client located at IP address. Yes, so the client means the defendant's computer. This is a strange term to me. I think that's a computer term that people use all the time. The techie who came up with that term didn't really know how lawyers view clients. Exactly. I'm guessing that Mr. Wagespac's computer did not want to be a client of the government, but that's another day's discussion. Speaking of Mr. Wagespac's computer, I don't know if you had anything else on the confrontation clause. No, Your Honor. On the evidentiary point, you do have to prove knowing. Yes, Your Honor. Distribution, knowing, possession. With respect to the knowing part of the equation, do you concede that merely using a peer-to-peer file sharing network isn't enough? It isn't enough in and of itself, Your Honor. I would concede that. So what beyond that do you need to prove, and what in the record could you infer that from? I don't know that I could give a list of what you need in every case because it's fact specific. In this case, what we have is that we have a sophisticated computer user, something that did not exist in the Carroll case from the Eleventh Circuit that the defendant cited. You have someone who is using CCleaner and Eraser and who is encrypting his child pornography. So you have someone, and there are even other icons that were on the desktop that led Special Agent Gone of the Louisiana Department of Justice to say that he was a very sophisticated user. All three of the Louisiana investigators, other than Agent Ferris, who was not involved in the investigation, but the three who were involved in the investigation, all said that he was sophisticated and highly educated based on what they saw on the computer. So you have that. You have somebody who knows what he's doing. He used the program. It's not that this thing just came on his computer, somehow he downloaded it, and then never used it. Tixotti, is that the program? Tixotti, yes, Your Honor. I've seen in other cases there are different names for things, Lime something and all that stuff. We're talking about Tixotti. We're talking about Tixotti in this case, and Tixotti is what they would call a client, Your Honor. They call it a client. So it may be that it's talking about talking to Tixotti rather than the computer itself. I'm not sure how that works. So you have he actually used. What is a sophisticated user? Sir? You said they said he was a sophisticated user. Yes, sir. What makes a person a sophisticated user? They based it on his use of CCleaner and having CCleaner monitoring constantly, that that's not something that your average, everyday person does. They based it also on his use of the eraser program to erase the unallocated space to get rid of things that had been deleted. Where do you get CCleaner? If I wanted that program, where could I get it? They said you can download it from the Internet, Your Honor. You can get it for free. I can pull it up right now on my government computer? Yes, sir. Yes, sir. What about the eraser? I'm not sure if there was testimony about where you can get eraser, but I would imagine you could probably, I don't know if you have to buy it or if you can just download it. I don't have to be sophisticated to find it. I wouldn't think so, Your Honor. Don't have to be sophisticated to download it. Probably not, Your Honor. Just got to be sophisticated to use it. And I think it's sophisticated to use it and also someone who wasn't sophisticated would have no interest in using it, I guess is another aspect. But, I mean, every so often you read an article you need to protect your privacy, so start putting never on whether someone can track your app, your app's location or something like that. So you get out your phone and you start putting never, never, never, and then the weather app doesn't work anymore because it doesn't know where you are. Does that suddenly make you sophisticated? Well, and there were other things, Your Honor. Okay, what else? Tell us about the what else. Also the use of the encrypted drive, which is something that… A person who reads an article and just realizes, oh, my gosh, there's a bunch of junk on my computer. Regardless of whether you're doing anything wrong, there's junk on your computer that you want to un-junk. And so let's push this button or download this thing or put never on my app. Well, the encrypted is not getting rid of the junk and it's not helping your computer. The encrypted is all about privacy. So it's putting something in a lockbox. And how does that prove that he knows he's distributing it? I think that's the bottom line here. I mean, it might prove possession, but how does it prove distribution? I guess, Your Honor, that's just one piece in the puzzle that I'm getting to is his sophistication. And your cases do say that that is an important element. And not only the encryption. There were other icons on the computer that Special Agent Goen said had to do with the registry of the computer that were very technical and he did not see on most people's computers. There was a software called Notepad++ that he said often indicated that the user was coding and that that was not something that was seen on most people's computers. Agent Miller said that he had never seen CCleaner and Eraser used by ordinary people, that he's been in the IT field for 20 years and he's never seen a business or he never personally had need to put it on his computer and that he's never seen businesses do that. So it seems to be connected with the intent to hide and he was able to carry that out and that's all part of showing that he was sophisticated. Am I right that the evidence shows that Taxati, which is this file sharing program that he downloaded, he manipulated, he changed default settings in, it automatically popped up to show you the progress of uploads and downloads. Is there evidence for that? I don't know if it automatically popped up. If you would open the program, the first page would show the progress is what the testimony was. Of uploads and downloads. Of the uploads and downloads, yes, sir. That is the testimony. So he would have that in his face if he opened this program up. He also was sophisticated enough to change the location of the download folder. Instead of having it in the default folder, he moved it to what he named the them folder and put it in the encrypted drive. So that, again, shows his awareness of how this program works and it would be very odd that he knew enough how to change that. He can look at it and see it has uploads and downloads. He can use the program to download, but he never could figure out that it's also sharing at the same time. It's like if you buy a car and you say, well, I know that it goes forward, but I had no idea it would go backward. I mean, he knows the program, he uses it, and he's sophisticated enough to know that it's making things available. At least that's a reasonable inference from the evidence. I think it is, Your Honor. A reasonable jury could make. I think it is, Your Honor. Beyond a reasonable doubt. I believe it is. The district judge thought it was, Your Honor, and the case law does say that the sophistication of the user is important as well as the design of the program and whether it provides any awareness. And as Judge Junkin pointed out, this program does make the user aware by saying, this is the status of uploads and this is the status of downloads. So those two things mean that this is not the same as these cases where all it is is tixati. You also have to remember that this man is searching for child pornography. He's out there in this world searching for child pornography, organizing his child pornography, looking at his child pornography. He knows, like everybody else out in this world, that this is what peer-to-peer software is and what it does. He's not an ignorant babe in the woods. And all of his history with child porn that's demonstrated on the computer is part of the evidence that shows that. How many images were actually found on the computer, admittedly in the unallocated space, but how many images? There were 2,878 images. And the jury knew that? Your Honor, I'm sorry. The jury was made aware of that? Yes, Your Honor. Special Agent Ferguson testified as to that number of images. Okay. Thank you. Thank you, Your Honor. Okay, Ms. Larson. Good morning, Your Honor. Moving first to the point that, Judge Duncan, you raised during my colleague's initial opening or initial argument. Excuse me. I'm a little bit nervous this morning. I appreciate your patience. You don't bite. This is my first time here. But moving into the sufficiency of the evidence, Judge Duncan, you raised some concerns about, is Texati on the computer? Is there other software on the computer? What other stuff is there? I think it's really important to keep in mind, specifically when it would get to the knowing possession of the child pornography in this case, that the only evidence found on the computer were these images in unallocated cached space. And so did the government establish that Mr. Weigesback had an interest in child pornography? I don't think that we can reasonably dispute that fact. But the case law shows that when images, and so this is coming from Moreland. The case law from that case says, look, even if someone has exclusive use and possession of a computer, and there are child pornography images found on that computer, if those images are found in the unallocated space, the slack space, then we get back to, you know, is there sufficiently expert computer knowledge to know about these Are there other facts that, you know, would show knowledge and dominion? In this case, the appellee is trying to kind of have it both ways. So on the one hand, the argument is Mr. Weigesback was clearly sophisticated because he installed all of these anti-forensic tools, which we don't concede that they're anti-forensic any more than Microsoft Word is specifically designed to write terroristic threats with. They've got legitimate uses, used legitimately by people. But on the other hand, if Mr. Weigesback knew that these images existed in his unallocated space and had access to and was using anti-forensic tools, it does not stand to reason that 2,800 images are found in this unallocated space. I think that fact cuts towards there not being sufficient evidence to show that Mr. Weigesback knew that he was in possession of these images that he could not access and that there was not evidence that he knew were there. How do images end up in unallocated space on a computer? There are a few different ways, Your Honor. One way is if you're online and you go to a website and there's images on that website. In this case, let's go with child pornography images. They get automatically created by Windows because they're a way of speeding up your loading time with the browser if you ever visit. It is true that if you download images, there are also thumbnails created, and those end up being cached as well. In this case, we don't have any searches for child pornography coinciding with or occurring immediately before the creation dates on these cached images. Let me ask you this. Sorry to interrupt. If you download the child pornography images and you erase them, they're still going to be in the unallocated space, right? That is correct. They don't go away forever. I know there's a way. We had another case. There's a way that the unallocated space can, bad things can happen to it. Yes, there is, Your Honor. That's not this case. Yet we do not allege that the FBI planted evidence in this case, Your Honor. Okay. I was here yesterday. All right, all right, all right. So we don't have to contend with that. But one way is you download it, you erase it, but the images persist in the unallocated space. Yes, Your Honor. That is absolutely possible. But our justice system demands more than a mere possibility, or even more probably than not. Mr. Wegesbach had the right to be convicted, beyond reasonable doubt, on the knowing possession. And the images that were found were not something that Mr. Wegesbach had access to, and it's our contention that the government did not sufficiently show that he knew that they were there. To be clear, back to my hypothetical, you download child pornography images, you delete them, they persist in the unallocated space. You don't have access to the unallocated space. That is correct, Your Honor. Was there any evidence, I didn't see it, that 2,800 images of child porn can just kind of end up on your unallocated space in your computer when all you're doing is just kind of living life and, you know, checking the weather and the newspaper? No, Your Honor. Because that's a little bit of a scary concept to me, I'd like to know. Is that, so if I've never been to a child porn site and I'm the only one who's ever used my computer, there's not 2,800 images sitting in some unallocated space on my computer? I see my time has expired. May I answer your question? Please do. Your Honor, there's no indication that child porn just magically ends up on someone's computer, and that's certainly not our contention here. The issue is whether there was sufficient evidence that Mr. Weigestback knew that these thumbnail images that he couldn't access were being created. And so our contention is not that Mr. Weigestback did not have an interest in child pornography and not even that he didn't seek it out. It's whether that he knew that there were these thumbnail images that were automatically created to which he had no access and whether or not the government sufficiently proved that he knew about those.  Thank you, Your Honor. I see why that's an argument better made to an appellate court than a jury, but thank you for that. Yes, Your Honor. Thank you. So thank you to all the counsel, Mr. Winston, and I guess Ms. Larson, your associate. You're court-appointed, and we appreciate you accepting that appointment. We appreciate your courage in coming, Ms. Larson and Ms. Jones. Of course, we appreciate your service as well. The case is under submission, and this panel has now concluded for the week.